SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**GREGORY R. NYHUS, OSB #913841**
Assistant United States Attorney
greg.r.nyhus@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-cr-00439-IM |
| v. | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **SANJAY KAUSHIK,** | |
| **Defendant.** | |

A sentence of 37 months, at the high end of the guideline range, for this serial illegal procurement agent is supported by the structures of 18 U.S.C. § 3553(a) and accounts for the seriousness of years of illegal procurement on behalf of Russia and other countries. A substantial sentence punishes defendant for significant and persistent evasions of Russian export controls and presents a deterrent to others engaged in the evasion of United States national security policy.

I.    BACKGROUND

    A.    Charges

On October 9, 2025, the defendant pled guilty to Count 1 of a three-count Indictment. Count 1 charged that beginning no later than on or about March 15, 2023, and continuing to at least on or about October 17, 2024, in the District of Oregon and elsewhere, defendant Sanjay Kaushik, together with others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to export and reexport, and cause the export and reexport, of items on the Commerce Control List, 15 C.F.R. Part 774, Supplement Number 1, including aircraft parts, components, and technology, from the United States to Russia and Russian end users without first having obtained the required license or authorization from the U.S. Department of Commerce for such exports and reexports, in violation of 50 U.S.C. §§ 4819(a)(1), (a)(2)(D) and 15 C.F.R. §§ 736.2, 746.8.

The maximum penalty for a violation of 50 U.S.C. § 4819 is 20 years, a $1,000,000 fine, up to three years of supervised release, and a statutory assessment of $100 per violation.

### B.     Plea Agreement

The defendant's guilty plea was entered pursuant to a written Rule 11(c)(1)(B) plea agreement. The Court is not bound by the recommendation of the parties or the presentence report. The defendant may not withdraw any guilty plea or rescind the plea agreement if the Court does not follow the plea agreement or the recommendations of the parties.

The government has agreed to dismiss the remaining two counts in the Indictment. Count 2 specifically charges the defendant with attempting to export goods in violation of the Export Control Reform Act and Export Administration Regulations, while Count 3 charges the defendant with making false statements. The indictment also includes a general property forfeiture allegation, although a final forfeiture order has not yet been filed in the case.

The defendant has waived his appeal rights, subject to a standard waiver with limitations, including constitutional limitations on that waiver.

## II. OFFENSE CONDUCT

### A. Legal Framework

1. The Export Control Reform Act and Export Administration Regulations

In part, the ECRA provides permanent statutory authority for the Export Administration Regulations. The ECRA provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled[.]" 50 U.S.C. § 4811(2). To that end, the ECRA grants the President the authority to control "(1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. 50 U.S.C. § 4812(a). The ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

The Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774, were promulgated by the Bureau of Industry and Security ("BIS"), an agency within the Department of Commerce, to regulate the export of goods, technology and software from the United States. Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items. *See* 15 C.F.R. §§ 734.2-.3. In particular, BIS placed restrictions on the export and re-export of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions

**Government's Sentencing Memorandum**                                                                                   **Page 3**

depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

The most sensitive items subject to the EAR controls are identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1. Items listed on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which is subject to export control requirements depending on destination, end use, and end user of the item.

    2.    Russian Export Controls

In response to Russia's 2022 invasion of Ukraine, the Department of Commerce imposed new license requirements on exports to Russia. As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia. *See* 87 Fed. Reg. 12,226 (Mar. 3, 2022). As of April 8, 2022, the license requirement for export to Russia was expanded to cover all items on the CCL. *See* 87 Fed. Reg. 22,130 (Apr. 14, 2022). These rules are codified in Title 15, Code of Federal Regulations, Section 746.8, which states, "a license is required . . . to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL." Any requests for licenses to export items on the CCL to Russia are reviewed under a policy of denial. *See* 15 C.F.R. § 746.8(b).

The EAR further impose, pursuant to the "Entity List" published at 15 C.F.R. part 744, Supp. No. 4, licensing and other requirements for exports to designated companies, businesses, research institutions, government and private organizations, individuals, and other types of legal persons that are subject to specific license requirements for the export, reexport, and/or transfer

(in-country) of specific items. If a license is required for a transaction, a U.S. party to the transaction must submit an export license application prior to export.

**B.     Factual background**

    1.     Introduction and Individuals

The BIS Office of Export Enforcement ("OEE") Resident Office in Portland, Oregon learned of a conspiracy involving the defendant, a citizen of India and Managing Partner of Arezo Aviation Services Limited ("Arezo Aviation") in India who conspired with others to procure export-controlled aerospace components on behalf of Russian entities in violation of ECRA. Specifically, Markus Kaltenegger ("Kaltenegger"), a citizen of Austria, is the owner of YoraCraft GMBH ("YoraCraft") in Austria. YoraCraft specializes in selling new and after-market spare parts for various aircraft. Evgeniy Bezverkhniy ("Bezverkhniy") is an individual believed to be in Russia. Bezverkhniy operates using a Russia-based phone number and is associated with a Russia-based company, PDS AVIA, LLC, a luxury aircraft charter, maintenance, and part procurement company, based in Moscow, Russia.

    2.     September 2023 AHRS Purchase

OEE's investigation began after YoraCraft initiated the procurement of an export-controlled Inertial Navigation System aviation component from a company based in the District of Oregon ("U.S. COMPANY 1"). Specifically, via email on September 6, 2023, YoraCraft requested from U.S. COMPANY 1 an LCR-100 Attitude and Heading Reference System ("AHRS").[1] YoraCraft negotiated a purchase order for $72,000 for the component with the "Ship

---

[1] The AHRS is a device that provides navigation and flight control data for aircraft, including their position, heading, and attitude. It uses a fiber-optic gyro and micro-electromechanical ("MEMS") accelerometers to find north. The AHRS gyro-compass feature eliminates the need for a magnetic sensing unit. The AHRS is used in a variety of aircraft, including turboprops,

**Government's Sentencing Memorandum**                                                                                                   **Page 5**

to" address reflecting Arezo Aviation in New Delhi, India, as provided in the purchase invoice. The defendant was identified as the point of contact for Arezo Aviation.

The AHRS is controlled for export by the Department of Commerce under ECCN 7A103 because of its application in missile guidance systems. A valid export license is required to export the item from the United States to most countries, including Austria and India (subject to specified exceptions for use in civilian manned aircraft), or Russia.

According to an email exchange between YoraCraft and the owner of U.S. COMPANY 1, the order was contingent upon the approval of an export license by the U.S. Department of Commerce.  Therefore, as part of U.S. COMPANY 1's compliance program, the owner requested that the end-user—purportedly Arezo Aviation in India—fill out and provide a Russia Sanctions certification document declaring its understanding of the EAR and license requirements for commercial aircraft parts for Russia.

In the signed declaration, the defendant stated that he would "not directly or indirectly export, reexport, or transfer (in country) items subject to the EAR, to Russia, Ukraine, or Belarus in violation of the EAR or other applicable laws."  Notably, the declaration contains an admonition regarding "…the new Russia license requirements and licensing policies for commercial aircraft components and expanded Russian military end use and military end user restrictions. . .".

---

business jets, IFR helicopters, regional aircraft, and military commercial-off-the-shelf applications.

**Government's Sentencing Memorandum**                                                            **Page 6**

> **Russia/Ukraine/Belarus**
> **Sanctions Certification**
>
> The undersigned (i) acknowledges the recent implementation of sanctions against Russia by the United Kingdom, the European Union, and the United States, including, without limitation, restrictions imposed by the U.S. Office of Foreign Assets Control and the U.S. Department of Commerce, which has implemented new Russia license requirements and licensing policies for commercial aircraft components, and expanded the existing Russian military end use and military end user restrictions under the Export Administration Regulations ("EAR"), and (ii) hereby certifies on behalf of the Purchaser of the order identified below, that with respect to such order, Purchaser will not directly or indirectly export, reexport, or transfer (in country) items subject to the EAR, to Russia, Ukraine, or Belarus in violation of the EAR or other applicable laws.
>
> PO# __038__
>
> I further certify that I am duly authorized to provide this certification.
>
> Print Name: __Sanjay Kaushik__     Signature: __[signature]__
>
> Title: __Managing Partner__     Date: __Sep-07-2023__
>
> Purchaser Company Name: __Arezo Aviation Services__
>
> Address: __S-456, Basement, opposite FORTIS HOSPITAL__
> __GREATER KAILASH II__
> __110048 New Delhi, India__

Similarly, the defendant also signed an end-use certificate, dated September 7, 2023, acknowledging that export of the item was subject to the EAR. In the end-use certificate, the defendant claimed that the item would be used in a civilian helicopter and specified a tail number of a civilian helicopter.

Based on the above information, U.S. COMPANY 1 applied for an export license from the U.S. Department of Commerce requesting authorization to export the AHRS to Arezo Aviation in India. On October 16, 2023, BIS export license D1336364 was approved for the

export of the AHRS to Arezo. The license issued by BIS specified that the AHRS was classified under ECCN 7A103.[2]

On the same day, in response to an email regarding the issuance of the license, Kaltenegger sent U.S. COMPANY 1 an email with shipping instructions, a shipping company account number, and listing the address for Arezo and point of contact as the defendant.

3. AHRS Detained

In October 2023, BIS learned from open-source trade data that, since July 2023, Arezo Aviation had sent 53 shipments with a total value of over USD $6 million to PDS AVIA, LLC, based in Moscow, Russia.  The trade records show that the most frequently declared item, with Harmonized Tariff Schedule[3] code 880730, is aircraft parts or goods, consistent with the nature of Arezo Aviation's business.

Based on the concern that Arezo Aviation was transshipping U.S. aerospace goods and technology to Russia, OEE requested that U.S. Customs and Border Protection ("CBP") Officers detain the impending export of the AHRS to India, which CBP did.

4. Post-Shipment Verification Interview

---

[2] ECCN 7A103 is an Export Control Classification Number used within U.S. export regulations under Title 15 of the Code of Federal Regulations, specifically the EAR, to control certain types of instrumentation and navigation equipment. These items are controlled primarily for Missile Technology (MT) and Anti-Terrorism (AT) reasons. ECCN 7A103 covers "Instrumentation, navigation equipment and systems, other than those controlled by 7A003, and specially designed components therefor".

[3] The Harmonized Tariff Schedule (HTS) is a system that classifies traded goods and sets tariff rates for imported merchandise.  The HTS classifies goods based on their name, intended function, and material composition.  It uses a hierarchical structure with 4- and 6-digit HS product categories, which are further subdivided into 8-digit U.S. rate lines and 10-digit statistical reporting categories.  The HTS sets statistical categories for imported merchandise used to determine tariff classifications for imported goods and to classify exported goods.

**Government's Sentencing Memorandum**                                                                 Page 8

OEE requested and obtained a post-shipment verification interview with the defendant in India. On January 17, 2024, a Department of Commerce Export Control Officer contacted defendant about the shipment. During the interview, the defendant stated that he was aware of U.S. export laws and the requirements to declare all involved parties during the export license process. The defendant acknowledged that he had approached Kaltenegger to procure the export controlled AHRS, which Kaltenegger brokered. The defendant then stated that Kaltenegger signed the Russia sanctions certification, end-use certificate, and the export compliance statement for the defendant with his permission (as discussed below, emails obtained during the investigation contradict the defendant's claim, showing that the defendant executed the documents.)

The defendant stated that the AHRS was being procured for Zaco Aviation, based in Prune, India, and acknowledged that the aircraft and end-user were different than the information provided in the end-use documentation. The defendant added that Kaltenegger randomly chose the tail number provided in the end-use documentation from an open-source aircraft registry.

Because the defendant acknowledged his understanding of U.S. export control laws but nonetheless forwarded false documentation and a false end-user declaration, which were sent to U.S. COMPANY 1 in support of his purchase for the AHRS, BIS revoked the license authorizing the export of the AHRS to India.

     5.    Email Review

On June 26, 2024, email content for the accounts associated with YoraCraft and used by Kaltenegger were obtained by search warrant.

A review of the emails show that the defendant lied to the Department of Commerce Export Control Officer during the post-shipment verification interview when he said that

Kaltenegger signed the export-control documents on his behalf, as emails show that Kaltenegger sent the documents to defendant, who returned the documents signed with the false end-user information.

On September 6, 2023, the same day U.S. COMPANY 1 responded with a quote to Kaltenegger for the AHRS, Kaltenegger appears to have sent himself an email addressed to "Evgeniy" (Evgeniy Bezverkhniy), an individual in Russia. The email identifies the AHRS by its specific part number for delivery to "Moscow" at a cost of US $152,000.00 each, more than twice the purchase price.

The next day, Kaltenegger sent an email to the defendant dated September 7, 2023, with three unsigned files related to the end-use of the export-controlled AHRS and an acknowledgement of Russian sanctions and export regulations. The documents were entitled, respectively, "End Use Certificate," "Russia Sanctions Cert." and "Export Compliance Statement."

On the same day, the defendant returned the documents to Kaltenegger in an email with a subject line denoting "end user", each of them signed. Kaltenegger then sent the three signed documents to U.S. COMPANY 1, which then relied upon and used this information in the application for an export license to the Department of Commerce.

6.   Payments

U.S. COMPANY 1 provided documents showing two incoming wire payments from YoraCraft totaling $72,000, consistent with the purchase agreement for the AHRS sold to YoraCraft. YoraCraft received the funds for the AHRS from Arezo Aviation on October 25, 2023. Specifically, a spreadsheet in Kaltenegger's iCloud account notes that "$126,185.32" was received from "Sanjay" for the AHRS.

**Government's Sentencing Memorandum**                                                                 **Page 10**

Investigators found a spreadsheet in Kaltenegger's iCloud account entitled "Evgeniy Workprogress.xlsx" in which Kaltenegger appeared to track whether each party had received the funds for a particular part, and who the "leader" for sourcing and purchasing the part was. The "Funds received by" column includes PDS, which, based on the context, is identifiable with PDS Avia, LLC, based in Moscow, Russia, with which Evgeniy Bezverkhniy is associated. The information that the money for the AHRS was received from PDS is consistent with screenshots found in the defendant's iCloud account showing that he received several credits from PDS AVIA in September 2023 into his Arezo Aviation bank account.

### III. GUIDELINES APPLICATION

#### A. Plea Agreement

Pursuant to the plea agreement, the government will argue:

- Pursuant to U.S.S.G. § 2M5.1, and the discussion below, the base offense level is 26 because "national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded."

- Pursuant to U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders), the government agrees that the defendant's offense level should be reduced by two levels.

- The government agrees that the defendant is entitled to a three-level reduction for Acceptance of Responsibility as set forth in U.S.S.G. § 3E1.1.

- The government will argue that defendant's total offense level should be 19.

#### B. Defendant Violated National Security Controls: Base Offense Level 26 Applies

A violation of 50 U.S.C. § 4819 is governed by U.S.S.G. § 2M5.1, which provides a base offense level of 26 "if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a

**Government's Sentencing Memorandum**  Page 11

financial transaction with a country supporting international terrorism[.]" The phrase "national security control or controls" should be given its plain meaning. Because the offense here involved evasion of export controls enacted to protect U.S. national security, the base offense level of 26 applies.

        1.      Defendant Violated the Export Control Reform Act, a National Security Control

The Export Control Reform Act was enacted to protect U.S. national security and foreign policy interests through export controls. *See* 50 U.S.C. § 4811(2) ("The national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled[.]"). The EAR, implemented under ECRA, are the primary mechanism through which those interests are protected.

The AHRS at issue here was classified under ECCN 7A103, which covers integrated navigation systems designed or modified for use in missiles and to improve navigational accuracy. ECCN 7A103 items are part of the multilateral Missile Technology Control Regime (MTCR) and appear on the EAR's Commerce Control List as dual-use items (commodities which can be deployed for either civil or military use). Although "national security" (NS) is not expressly listed as the control reason on the license, ECCN 7A103 items are controlled for two interrelated purposes: (1) Missile Technology (MT), reflecting MTCR objectives to limit the proliferation of missile systems capable of delivering weapons of mass destruction, and (2) Anti-Terrorism (AT), a control designed to prevent terrorist use of these items. While the EAR identifies different categories of controls—such as national security (NS), missile technology (MT), nuclear nonproliferation (NP), and regional stability (RS), *see* EAR, 15 C.F.R. § 742.1— all such controls serve the overarching purpose of protecting U.S. national security.

**Government's Sentencing Memorandum**          **Page 12**

2.  Defendant Evaded National Security Controls by Violating Russian Sanctions

Following Russia's invasion of Ukraine, BIS significantly expanded export controls directed at Russia. On May 9, 2022, BIS imposed new license requirements for exports and reexports to Russia for items subject to the EAR with specified Harmonized Tariff Schedule codes. *See* 87 Fed. Reg. 28,758 (May 13, 2022). These measures were intended "to further restrict Russia's ability to withstand the economic impact of the multilateral sanctions, further limit sources of revenue that could support Russia's military capabilities, and to better align with the European Union's controls." Additional rules—87 Fed. Reg. 12226 (Russia Sanctions rule) and 87 Fed. Reg. 12856 (Russia Industry Sector Sanctions)—further restricted Russia's access to items needed to support its military capabilities. These actions were taken pursuant to, among other authorities, the International Emergency Economic Powers Act (IEEPA) and ECRA, which are separate but related statutes: ECRA provides permanent authority for most export controls, while IEEPA grants the President broad emergency economic powers for other purposes, including sanctions.

On February 21, 2022, the President issued Executive Order 14065, which expanded the scope of previous executive orders and found that Russian conduct since the invasion of Ukraine "further threatens the peace, stability, sovereignty, and territorial integrity of Ukraine, and thereby constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States."

Consistent with these concerns, on February 24, 2022, the Department of Commerce amended the EAR to impose license requirements for Russia on items classified under any ECCN in Categories 3 through 9 of the CCL, which includes the AHRS at issue in this case.. *See* Implementation of Sanctions Against Russia Under the EAR, 87 Fed. Reg. 12226 (effective Feb.

**Government's Sentencing Memorandum**                                                                                                    **Page 13**

24, 2022). The Department of Commerce expressly stated that "Russia's invasion of Ukraine flagrantly violates international law, is contrary to U.S. national security and foreign policy interests, and undermines global order, peace, and security," and that the resulting export controls "protect U.S. national security and foreign policy interests by restricting Russia's access to items that it needs to project power and fulfill its strategic ambitions." *Id.* The rule specifically highlighted restrictions on "parts and components used in civil aircraft" and items "necessary for the functioning of aircraft," noting that such measures can significantly limit Russia's ability to obtain items it cannot produce domestically. *Id.*

For dual-use aerospace commodities and technology (technology and goods which have both military and civilian applications) Russian procurement agents frequently rely on intermediaries in third countries and false civilian end-use narratives to evade U.S. export controls. The EAR contains a license exception for ECCN 7A103 items that applies to export, reexport, and in-country transfers for certain countries when "the commodities are for use in or for the 'production' of civil manned aircraft," 15 C.F.R. § 740.15(b)(2)(ii); this exception applies to Austria and India but does not apply to Russia. As a result, the defendant was uniquely positioned to circumvent U.S. export control policy by falsely claiming that the AHRS was destined ultimately to India, when in fact, the defendant knew the AHRS was already sold to a Russian recipient, in violation of U.S. export control laws.

Although there is no definitive proof that the AHRS was procured for a military end user or for missile navigation, the expanded Russia license requirements and end-user restrictions were imposed precisely because of heightened national security concerns arising from Russia's invasion of Ukraine. The Department of Commerce's decision to require a license for export of the AHRS to Russia reflects an explicit determination that such exports, absent authorization, are

**Government's Sentencing Memorandum**                                                          **Page 14**

detrimental to U.S. national security. *See United States v. Shih*, 119 F.4th 1136, 1138 (9th Cir. 2024) (declining to "'substitute the judgment of a factfinder for that of the executive branch' about which exports threaten national security") (citation removed).

        3.       The EAR and Commerce Control Lists are National Security Controls

The Sentencing Guidelines make clear that willful violations of regulatory regimes designed to protect national security implicate the "substantive harms" that warrant the higher base offense level. *See Shih*, 119 F.4th at 1141. The term "national security controls" is not defined by the Sentencing Guidelines, the Commentary, or the Application Notes, and courts have repeatedly held that export controls enforced under the EAR constitute "national security controls" for purposes of U.S.S.G. § 2M5.1(a)(1), even where the specific ECCNs at issue also serve foreign policy or treaty-related objectives.

In *Shih*, 119 F.4th 1136, the Ninth Circuit affirmed a sentence in a case in which the district court applied a base offense level of 26 pursuant to U.S.S.G. § 2M5.1(a)(1). A jury found Shih, a UCLA electrical engineering professor, guilty of violating the EAR, which at the time of the conduct at issue was statutorily enforced through IEEPA. The court rejected Shih's argument that the lower base level should apply because the ECCNs associated with the commodity at issue were foreign policy rather than national security controls.

Shih argued that the ECCNs associated with his specific commodity were foreign policy controls, not national security controls, because they were added to the EAR's CCL to satisfy this country's treaty obligations. The Court rejected this argument because, even if these ECCNs were added to the CCL to comply with a treaty, it does not follow that the ECCNs cannot also be national security controls, and noted that "[w]e have previously held that the higher base offense level in § 2M5.1(a)(1) applied when the defendant evaded national security controls by exporting

**Government's Sentencing Memorandum**                                                        **Page 15**

thermal imaging cameras without a license, conduct not as egregious as the ones mentioned in that subsection." *Shih*, at 1140, citing *United States v. Liang*, 537 Fed. App'x 710, 711 (9th Cir. 2013).

The Eleventh Circuit, upholding a base offense level of 26 for the export of non-military rebreathers without a license, notes that:

> [t]he EAR . . . is clearly a system of 'national security controls.' *See* 15 C.F.R. § 730.6 (explaining that the EAR is 'intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States'); *see also United States v. Elashyi*, 554 F.3d 480, 509-09 (5th Cir. 2008) (holding that export controls under [a separate sanctions regime] are 'national security controls' for purposes of § 2M5.1(a)(1); *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (same); *United States v. Shetterly*, 971 F.2d 67, 76 (7th Cir. 1992) (same under the [Export Administration Act (predecessor to the Export Control Reform Act)]).

*United States v. Sotis*, 89 F.4th 862, 879-80 (11th Cir. 2023).

The defendant's argument – that the higher offense level cannot apply absent proof that the sale of a good implicates national security concerns - has been foreclosed. *United States v. McKeeve*, 131 F.3d 1, 14 (1st Cir. 1997) (rejecting contention that U.S.S.G. § 2M5.1(a)(1) cannot apply in a sale-of-goods case without evidence that the sale of that item constitute an actual threat to national security). Further, the Court in *Shih* stated that the Commission provided a lower base offense level for simple recordkeeping and reporting offenses, while "'substantive harms' associated with criminal regulatory offenses [] warrant the higher base offense level." *Id.* at 1141. This defendant was not merely a recordkeeper.

Because the items the defendant attempted to export were regulated under the EAR, because those regulations are an established system of national security controls, and because the unlicensed export of such items to Russia was expressly determined to threaten U.S. national

**Government's Sentencing Memorandum**                                                              **Page 16**

security and foreign policy interests following Russia's invasion of Ukraine, the offense involved the evasion of "national security controls."

Accordingly, the base offense level of 26 under U.S.S.G. § 2M5.1(a)(1) applies.

## IV. RECOMMENDATION

The government recommends defendant be sentenced at the high end of the guidelines. Defendant and Kaltenegger have been engaged in a conspiracy to supply aviation technology and goods to Russian end-users in violation of U.S. law and have maintained and enjoyed a close relationship since at least 2022. The defendant persistently knowingly and willfully sought to evade U.S. national security controls and received substantial compensation for doing so. WhatsApp accounts, emails, payment information and other communications document continued engagement with Russian and Iranian numbers. Kaltenegger and defendant split a lucrative commission for their illicit efforts.

Significantly, the defendant understood that his conduct was in violation of U.S. law and continued to actively thwart U.S. national security controls anyway. The defendant's iCloud account contained a screenshot from the defendant's phone in which he appeared to be in a video chat with an unidentified male. Captured on his phone screen was an article titled, "US Threatens Russian Neighbor." The article, dated April 25, 2023, discussed the potential consequences for Kazakhstan in relation to helping Russia evade U.S. sanctions. The screenshot is dated April 26, 2023, well before he sought to procure the AHRS from the United States.

Despite his knowledge regarding U.S. export controls, the defendant sought Russian customers for aircraft commodities business despite warnings of international sanctions against Russia and depended on his close partner, Kaltenegger, to interface with U.S. companies to procure export-controlled U.S. aviation goods that were ultimately intended for Russia.

**Government's Sentencing Memorandum**                                                              **Page 17**

Numerous emails, some dating as far back as December 2022, outline the defendant's efforts to do business with Russian entities, and contracts for the supply of aircraft related commodities, in both English and Russian, bear the defendant's signature. Commodities included electronics, adaptive flight displays, air data computers, common computing modules, pressure valves, generators, spare parts and other items - all in violation of U.S. national security controls and export control laws. Sales documents corresponding to the procurement contracts show that Kaltenegger organized the receipt of these commodities with agents in Moscow, Russia.

The defendant and Kaltenegger illegally procured aircraft commodities on behalf of at least one entity-listed company: AirCompany Northwest, LLC, was added to the U.S. Department of Commerce Entity List on December 7, 2023, pursuant to §744.11 of the EAR, because it was, according to information published in Federal Register Vol. 88, No. 234: "believed to have procured and transshipped U.S.-origin avionics equipment to Russia, including to governmental entities and military end users, both before and after Russia's invasion of Ukraine on February 24, 2022. . . . BIS imposes a license requirement for all items subject to the EAR and will review license applications under a presumption of denial."

Kaltenegger kept careful track of his shared "Commission," which was split between Bezverkhniy, Kaltenegger, and defendant. In an email dated September 11, 2023, from Kaltenegger to defendant titled "Commission Evgeniy," Kaltenegger provided a break-down of the cost of each item from the United States, the sales price to the Russian end-user, and the profit for each party.  profit was listed as $4,406.50.

The defendant and Kaltenegger worked together to purchase more than $1.7 million in components on behalf of their Russian procurement agent – after sanctions were in place. According to Kaltenegger's spreadsheet, the three of them routinely added approximately

$300,000 to the price for the Russian end-user and then split the profits between the three. According to the spreadsheet, the defendant was paid well in excess of $75,000.

## V. CONCLUSION

Defendant should be sentenced at the high-end of the guideline range, or 37 months. Defendant actively sought to undermine U.S. national security, evade sanctions and other export controls for a significant period. Defendant worked with Kaltenegger and others to routinely exploit his position in India and take advantage of India's favored status to circumvent U.S. national security and export controls – the effect of which directly or indirectly supported Russia's invasion of Ukraine.

Dated: January 8, 2025

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ Gregory R. Nyhus

_____
GREGORY R. NYHUS, OSB # 91384
Assistant United States Attorney